FILED

2009 JUL 15 PM 12: 02

CLERK U.S. DISTRICT COURT
CENTRAL DIST. O. CALIF.
LOS ANGELES

BY _____

1  John D. Klinedinst, Bar No. 86254
2  Gregor A. Hensrude, Bar No. 226660
   Samuel B. Strohbehn, Bar No. 257697
3  KLINEDINST PC
   777 S. Figueroa St., 47th Floor
4  Los Angeles, California 90017
   (213) 607-2115/FAX (213) 607-2116
5  jklinedinst@klinedinstlaw.com
   ghensrude@klinedinstlaw.com
6  sstrohbehn@klinedinstlaw.com

7  Edward E. Casto, Jr., Esq.
   Barry J. Bumgardner, Esq.
8  Steven W. Hartsell, Esq.
   NELSON BUMGARDNER CASTO, P.C.
9  5601 Bridge Street, Suite 300
   Fort Worth, Texas 76112
10 817-377-9111/FAX 817-377-3485

11 Attorneys for Plaintiff
   GUARDIAN MEDIA TECHNOLOGIES,
12 LTD.

13             **UNITED STATES DISTRICT COURT**

14            **CENTRAL DISTRICT OF CALIFORNIA**

15

                   SACV09-0813 JVS MLGx

16 GUARDIAN MEDIA                  Case No.
   TECHNOLOGIES, LTD.,
17                                 **COMPLAINT**
          Plaintiff,
18                                 Date
          v.                       Time:
19                                 Courtroom:
   BENQ AMERICA CORPORATION,       Judge:
20                                 Magistrate Judge:
          Defendant.              Complaint Filed:
21                                 Trial Date:      None set

22       Plaintiff Guardian Media Technologies, Ltd. files this Complaint against BenQ

23 America Corporation ("BenQ" or "Defendant"), alleging as follows:

24                                 **I.**

25                            **THE PARTIES**

26       1.    Pursuant to the Court's directives during a hearing held on June 15, 2009,

27 the filing date of this complaint relates back to April 20, 2009, which is the filing date of

28 an original complaint for infringement against Defendant. This original complaint was

**COMPLAINT**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

dismissed without prejudice by the Court with an Order for Guardian to file this subsequent complaint.

2.    Plaintiff Guardian Media Technologies, Ltd. ("Guardian") is a Texas Limited Partnership.  Guardian has a mailing address at 3801 N. Capital of Texas Highway, E240-303, Austin, Texas 78746.

3.    Defendant BenQ America Corporation ("BenQ") is a corporation organized and existing under the laws of the State of California with its principal place of business located at 15375 Barranca Parkway, Suite A-205, Irvine, California, 92618.  BenQ can be served via its registered agent for service of process: CT Corporation System, 818 West Seventh Street, Los Angeles California 90017.

## II.

## JURISDICTION AND VENUE

4.    This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject matter jurisdiction of the action under Title 28 U.S.C. §1331 and §1338(a).

5.    The Court has personal jurisdiction over Defendant, and venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b).

6.    Defendant has substantial contacts with the forum as a result of pervasive business activities conducted within the State of California and within this District, including but not limited to the manufacture, sale, and/or distribution of televisions, and/or computers capable of playing DVDs and/or receiving television and/or video programs.

7.    Defendant has committed acts of patent infringement, directly and/or through agents and intermediaries, by shipping, distributing, importing, offering for sale, and/or selling certain infringing products in California and, particularly, the Central District of California.

8.    Defendant has purposefully and voluntarily placed one or more of its infringing products into the stream of commerce with the expectation that they will be

- 2 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1  purchased by consumers in the Central District, who in turn use the products in an

2  infringing manner in this District.

### III.

### <u>PATENT INFRINGEMENT</u>

9.  On May 29, 1990, United States Patent No. 4,930,160 (the "'160 patent") was issued for "Automatic Censorship of Video Programs." A true and correct copy of the '160 patent is attached hereto as Exhibit "A" and made a part hereof. On April 7, 2009, the United States Patent and Trademark Office issued a reexamination certificate for the '160 patent. A true and correct copy of this reexamination certificate is attached hereto as Exhibit "B" and is made a part hereof.

10.  Guardian is the owner of the '160 patent ("the patent-in-suit") with all substantive rights in and to the patent-in-suit, including the sole and exclusive right to prosecute this action and enforce the patent-in-suit against infringers, and to collect damages for all relevant times. The patent-in-suit is expired.

11.  As it pertains to this lawsuit, the '160 patent generally relates to parental control features contained in televisions and other products offered for sale by Defendant that allow owners of such devices to restrict viewing of certain movies and other video content based on the particular program's rating. *See* 47 C.F.R. 15.120.

12.  Prior to the expiration of the patent-in-suit, Defendant directly or through intermediaries, made, had made, used, imported, provided, supplied, distributed, sold, and/or offered for sale televisions and other devices that infringed one or more claims of the '160 patent. In addition, Defendant induced infringement and/or contributed to the infringement of one or more of the claims of the '160 patent by others.

13.  Guardian has been damaged as a result of Defendant's infringing conduct. Defendant is, thus, liable to Guardian in an amount that adequately compensates it for their infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

///

14. Upon information and belief, Defendant's infringements were deliberate and with full knowledge of the '160 patent. Defendant's infringements were willful from the time Defendant became aware of the '160 patent and due to the infringing nature of their respective activities, Guardian is entitled to increased damages (up to three times) for the period of such willful infringement pursuant to 35 U.S.C. § 284.

**IV.**

**JURY DEMAND**

15. Guardian hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**V.**

**PRAYER FOR RELIEF**

Guardian requests that the Court find in its favor and against Defendant, and that the Court grant Guardian the following relief:

a. Judgment that one or more claims of United States Patent No. 4,930,160 have been infringed, either literally and/or under the doctrine of equivalents, by Defendant and/or by others to whose infringement Defendant has contributed and/or by others whose infringement has been induced by Defendant;

b. Judgment that Defendant account for and pay to Guardian all damages to and costs incurred by Guardian because of Defendant's infringing activities and other conduct complained of herein;

c. That, to the extent Defendant had knowledge of its infringing activities, Defendant's infringements be found to be willful from the time that Defendant became aware of the infringing nature of their respective activities, and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

d. That Guardian be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**COMPLAINT**

1    e.    That this Court declare this an exceptional case and award Guardian its

2 reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

3    f.    That Guardian be granted such other and further relief as the Court may

4 deem just and proper under the circumstances.

5

6                                          KLINEDINST PC

7

8 DATED: July 14, 2009            By: _____

9                                          John D. Klinedinst
                                           Gregor A. Hensrude
10                                         Samuel B. Strohbehn
                                           Attorneys for Plaintiff
11                                         GUARDIAN MEDIA
                                           TECHNOLOGIES, LTD.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

COMPLAINT

# Exhibit "A"

# United States Patent [19]

## Vogel

[11] Patent Number: **4,930,160**

[45] Date of Patent: **May 29, 1990**

[54] **AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS**

[76] Inventor: **Peter S. Vogel,** 28 Adeline Street, Faulconbridge NSW 2776, Australia

[21] Appl. No.: **237,176**

[22] Filed: **Aug. 29, 1988**

[30] **Foreign Application Priority Data**

Sep. 2, 1987 [AU] Australia ................................ PI4107

[51] Int. Cl.⁵ .............................................. H04K 1/00

[52] U.S. Cl. ........................................ **380/23;** 358/84; 358/349; 455/2; 455/4; 380/20; 340/825.34

[58] Field of Search ........................................ 380/3–5, 380/23, 20; 364/200, 900, DIG. 545; 358/84, 86, 139, 908, 349; 455/2, 4–6, 67–70; 340/825.31, 825.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,859,457 | 1/1975 | Kirk, Jr. ............................ | 358/86 X |
| 3,919,479 | 11/1975 | Moon et al. ...................... | 358/84 X |
| 4,331,974 | 5/1982 | Cogswell et al. ................ | 358/86 |
| 4,520,404 | 5/1985 | Von Kohorn .................... | 358/84 X |
| 4,530,008 | 7/1985 | McVoy ............................... | 380/23 |
| 4,605,973 | 8/1986 | Von Kohorn ...................... | 455/4 X |
| 4,620,229 | 10/1986 | Amano et al. ..................... | 358/349 |
| 4,685,131 | 8/1987 | Horne ................................ | 358/86 X |
| 4,718,107 | 1/1988 | Hayes ................................ | 455/4 |
| 4,750,213 | 6/1988 | Novak ............................... | 455/67 |
| 4,814,883 | 3/1989 | Perine et al. ...................... | 358/84 X |

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory

[57] **ABSTRACT**

A video program is received from a broadcast or video recording and displayed for viewing. On receipt of a prescribed classification code or group of codes display is switched to an alternative source. The classification code can be encoded into the broadcast or tape being viewed, or can originate from a separate source. The alternative material displayed can be another broadcast, a local recording, a locally-generated pattern, or other material. The codes which cause the display to be switched to the alternative source can be set by the user after entering a personal identity number.

26 Claims, 5 Drawing Sheets





Fig. 1



Fig. 2

**U.S. Patent**        May 29, 1990        Sheet 3 of 5        **4,930,160**

SET CLASSIFICATION



Fig. 3

**U.S. Patent**   May 29, 1990   Sheet 4 of 5   **4,930,160**



Fig. 4

**U.S. Patent**    May 29, 1990    Sheet 5 of 5    **4,930,160**



Fig. 5

4,930,160

1

## AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, automatic censorship of video programs. The term video program used hereinafter refers to television programs broadcast free-to-air or by cable or by satellite, and other forms of mass distribution of video programs, including distribution by video tape or other media. The term also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

The need for censorship of video material is generally accepted by most societies, for the purposes of preventing the viewing of material by persons other than the target audience. Usually, such censorship takes the form of limiting access of a certain group of people, for example children, to a certain class of material, for example pornographic or violent movies. Other uses of censorship include voluntary self-censorship in cases where a recipient of a program does not wish to be exposed to certain types of program, for example scenes of great violence, advertisements which may be considered offensive, or non-program material which interrupts movies, drama or sports broadcasts.

Being the most widely accessible form of broadcasting, television is the medium with which the problem of censorship is experienced most. Traditionally, censorship of television takes the form of either preventing possibly offensive material from being broadcast in the first place, or voluntary self-censorship, that is, switching off the receiver when material which the viewer does not wish to experience is being broadcast. Another form of self-censorship, which has gained popularity since the introduction of remote controls for television sets is the phenomenon known as "zapping". Zapping involves eliminating unwanted material by muting the receiver or changing channels for the duration of the unwanted segment. While such self-censorship offers the benefit that all classes of material remain available to those who do not find them objectionable, it suffers from the inconvenience of having to anticipate the nature of broadcasts and operate the receiver appropriately. This process is tedious and error-prone, especially where the viewer wishes to suppress program material which changes rapidly in nature, for example when the viewer desires to suppress commercial messages within an otherwise unobjectionable program. Manual censorship is therefore not an entirely satisfactory solution.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be automatically suppressed.

Arrangements for automatic censorship have been previously published, but suffer from a number of serious shortcomings. The main difficulty is that automatic means for discrimination of different program classifications, for example detection of television commercials, have been complex and unreliable. One technique has been to detect television commercials by the short period of black picture and silence separating them from other program material. A typical commercial-deleter of this type is described in U.S. Pat. No. 4,319,286. This system and others like it suffer from the problem that erroneous operation occurs if there is a brief period of black and silence in a broadcast at a time other than at

2

the beginning of a commercial break, or if there is no separation between commercials and other program material. Furthermore, such systems are unable to distinguish between resumption of desired program and further commercials at the conclusion of a commercial. Resumption of viewing or recording must therefore be controlled by some form of timing device, based on assumptions regarding the length of commercial breaks. If these assumptions are not correct, the system will fail in its function.

A much improved censorship means is described in U.S. Pat. No. 4,520,404. This system relies on a human operator to classify broadcasts, based on observation at a monitoring station. A suitably coded message is distributed from the monitoring station to the viewer's home, at which point a suitably-equipped decoder controls the television receiver or video recorder in accordance with the classification data generated by the human operator at the monitoring station. Although this invention significantly improves upon the reliability of previous methods, it nevertheless suffers significant limitations. One limitation is the difficulty of accurately predicting at the monitoring station when a change of program is going to occur, making the system somewhat error prone. Another limitation is that when the system is used under the control of one party to control the viewing of another party, for example parents to limit viewing by children, it is necessary to provide control means by which the class of program to be censored can be selected, and it is therefore possible for the other party to use these controls to disable the censorship, thereby defeating the function of the system. Yet another limitation is that during the period that unwanted material is being censored, the receiver is simply disabled. The viewer is therefore periodically presented with a blank screen and/or silence, which may have the undesirable effect of causing alarm when program suddenly resumes, or may be mistaken for a receiver malfunction.

The prior art methods are also deficient in that they do not provide means whereby an authorized person can selectively disable viewing of certain classifications of pre-recorded video programs.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of receiving video programs whereby the censorship function is provided automatically, substantially resolving the abovementioned shortcomings of the prior art as well as providing other benefits.

According to a first aspect of the present invention, there is provided a video program receiving method capable of automatically censoring video programs comprising the steps of receiving a video program, with accompanying audio if any, receiving a classification signal indicative of the content of the program being received, decoding the classification signal and, according to functions selected by the user, causing the receiver to direct to its output alternative program material for the duration of program of selected classification.

According to a second aspect of this inventive concept, apparatus for receiving and automatically censoring video program is also provided, and comprises a video program receiver, a classification signal receiver, a controller equipped to decode said received signal and

4,930,160

**3**

to control switching means which, according to functions selected by the user at the receiving station, cause the receiver to direct to its output alternative program material for the duration of program of selected classification.

The term "receiver" used herein is defined in the broad sense of apparatus for converting television signals (and their associated sound signals) into visual and audible signals, or apparatus for converting modulated carrier signals into video and/or audio signals suitable for display by video monitors or audition via amplifiers and loudspeakers. For example, the term receiver includes off-air domestic television sets, as well as apparatus known commonly as a "video monitor". The term "receive" is used in the broad sense of accepting signal from any signal conveyance means, for example, from an antenna, cable, optical fiber, magnetic tape, or optical disk.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications to be censored only upon entering of a security code, or personal identification number (PIN), by the user.

BRIEF DESCRIPTION OF THE DRAWINGS

Some embodiments of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of a first embodiment of the invention in which the program classification is encoded into the vertical interval of the video signal;

FIG. 2 is a schematic diagram of the operational loop of the program executed by the microcomputer of the first embodiment;

FIG. 3 is a schematic diagram of the software used in either embodiment for setting classifications;

FIG. 4 is a schematic diagram of the software used in either embodiment for overriding the censorship function; and

FIG. 5 is a schematic block diagram of a second embodiment of the invention in which the program classification is received by the invention from a transmission source other than the program to be censored.

DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a television receiver or monitor, including audio amplifier 11, loudspeaker 12, CRT driver 10 and CRT 13. Under normal conditions, the sources of video and audio are selected from video input 3 and audio input 1 respectively. However when the selector means, relay 7 is energized, alternate audio input 2 and alternate video input 4 are selected instead. Both sets of audio and video inputs may derive from any source, for example a television tuner or video tape player.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal operation of television receivers. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting

**4**

services such as Teletext. The classification may be pre-recorded on tapes being broadcast or played locally, or inserted in a video signal prior to transmission at the broadcasting station at the time of broadcast. The means for inserting such signals is well known.

Upon arrival at video input 3 of the invention, as well as being fed to the display system, the video portion of the program is fed to line code extractor 5, which comprises means for isolating the desired line (in this embodiment line 16), extracting the digital word from that line, and presenting it as an output readable by microcomputer 6.

Microcomputer 6 is a self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Of course, microcomputer 6 may also perform many other functions required by the receiver, as well as those of this invention. One of the output ports of microcomputer 6 controls relay 7. Other ports read data from keyboard 8 and send data to display 9.

Keyboard 8 is a press-button key array, which contains keys for control of all the usual television functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications to be censored, an OVERRIDE key, used to disable the censorship function, and a RESUME key, used to resume censorship after OVERRIDE. The usual channel selection keys of the receiver of this embodiment serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys can serve double functions if desired.

Display 9 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs, or a video character generator which causes characters to be superimposed on the CRT display.

The censorship function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from line code extractor 5, is read, and an address is generated as a function of the code. A table is stored in the RAM of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, relay 7 is energized, causing the video and audio signals to be switched to the alternate sources. If the bit is clear, relay 7 is released, with the opposite effect. This procedure is repeated as a loop at high speed, so that the operation of relay 7 follows instantaneous changes in classification codes arriving at the video input of the invention.

In order to allow authorized users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

5

Referring now to FIG. 3, when the SET CLASSIFICATION key has been pressed, microcomputer 6 first requests, via display 9, that the user enter the PIN. A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 8. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the last element of the array has been programmed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Advertisement (commercial product or service promotion)
2. Non-program material (includes advertisements, station identification, community service announcements, commentary during movies etc.)
3. Restricted. Programs deemed by the government censors to be unsuitable for viewing by children.

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always enable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorized person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 8. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, relay 7 is released, and the program continues looping until the RESUME key is pressed, with the result that no censoring action occurs until the RESUME key is pressed.

A second embodiment of the invention is shown in FIG. 5. This embodiment is similar to the first embodiment, except that classification codes are received from a source separate from the source of video program. In this case, classification receiver 14 is provided to receive classification signal input 15, which can arrive from any source, for example a radio transmitter distinct from the transmitter broadcasting the video program. This embodiment of the invention is not suited to operation with prerecorded tapes as program source. Operation of this embodiment is the same as the first embodiment, except that classification codes are read from classification receiver 14, rather than line code extractor 5, by microcomputer 6. The software executed by microcomputer 6 is also the same. The capabilities of both embodiments could easily be combined.

The foregoing describes only some embodiments of the present invention and modifications, obvious to

6

those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where a broadcast program is being viewed, more than one channel of broadcast is available, and the classification signal is being received from a source other than the broadcast being received, it is desirable that each classification code received be identified as relating to a particular channel, so that censorship can be based on which channel is being viewed or recorded. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

For the purpose of implementing the invention without needing to modify the television receiver, the invention can comprise a standard television receiver in combination with a special controller which controls operation of the receiver by means of the remote control interface of the television receiver, if the receiver is equipped with remote control. That is, the censorship controller is equipped with interface means compatible with the remote control communication standard, for example an infra-red transmitter, so muting, blanking, channel-changing, or other censorship actions can be effected using unmodified receiving equipment. The channel-change function can provide the facility of displaying alternative material during periods of censorship. For example, a suitable pattern generator tuned to an unused television channel could be used to provide "electronic wallpaper" during commercial breaks. In some applications it may be desirable to implement some functions of the invention, such as PIN entry, in the remote controller, and other functions, such as the censorship function, in the receiver.

Whereas the switching means of the embodiments described herein is a relay, any form of suitable switch, such as a solidstate arrangement, can be used.

The alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player. The local source may also be simply a black signal generator. Furthermore, the invention is not limited to providing only one alternative program source.

Whereas one embodiment of the invention described above relies upon signals encoded into the video portion of the received program, the invention can also be effectively implemented using signals embedded into the audio portion of the program, using any of the available well-known techniques which do not interfere with normal sound reception.

What I claim is:

1. A video program reception method comprising the steps of:

storing in memory means a set of codes descriptive of video program classifications,

receiving a video signal and associated audio signal if present,

receiving a program classification code descriptive of said video signal,

accessing said memory means and comparing the contents thereof with said code, and,

if the result of said comparison indicates that the received program is to be displayed, causing the received video signal to be selected for display,

if the result of said comparison indicates that an alternative video signal is to be displayed, causing an

4,930,160

7

alternative source of video signal to be selected for display; and

displaying the selected video signal on a video display means.

2. A video program reception method according to claim 1, wherein the alternative source of video signal originates from a remote transmitter.

3. A video program reception method according to claim 1, wherein the alternative source of video signal is local to the receiving station.

4. A video program reception method according to claim 1, comprising the further steps of:

inputting from the user a personal identity number,

comparing said number to a stored number, and if said numbers are equal,

permitting the user to alter the codes stored within said memory means.

5. A video program reception method according to claim 4, wherein the alternative source of video signal originates from a source remote to the receiver.

6. A video program reception method according to claim 4, wherein the alternative source of video signal is local to the receiving station.

7. A video program reception method according to claim 6, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

8. A video program reception method according to claim 4, wherein the program classification code is encoded into the video component of the program.

9. A video program reception method according to claim 4, wherein the program classification code is encoded into the audio component of the program.

10. A video program reception method according to claim 4, wherein the program classification code is not encoded into the program being received but is received from a separate source.

11. A video program reception method according to claim 1, wherein the program classification code is encoded into the video component of the program.

12. A video program reception method according to claim 1, wherein the program classification code is encoded into the audio component of the program.

13. A video program reception method according to claim 1, wherein the program classification code is not encoded into the program being received but is received from a separate source.

14. A video program receiver comprising:

a video signal receiver,

a program classification code receiver,

a program classification code memory,

means for accessing said memory and comparing the contents thereof with received codes,

8

selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed, and

means for displaying the selected video signal.

15. A video program receiver according to claim 14, wherein the alternative source of video signal originates from a remote transmitter.

16. A video program receiver according to claim 14, wherein the alternative source of video signal is local to the receiving station.

17. A video program receiver according to claim 14, further comprising:

means for inputting from the user a personal identity number,

means for comparing said number to a stored number, and control means permitting the user to alter the contents of said memory only if the compared numbers are equal.

18. A video program receiver according to claim 17, wherein the alternative source of video signal originates from a source remote to the receiver.

19. A video program receiver according to claim 17, wherein the alternative source of video signal is local to the receiving station.

20. A video program receiver according to claim 19, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

21. A video program receiver according to claim 17, including means for deriving the program classification code from the video component of the program.

22. A video program receiver according to claim 17, including means for deriving the program classification code from the audio component of the program.

23. A video program receiver according to claim 17, including means for receiving program classification code from a source other than the program being received.

24. A video program receiver according to claim 14, including means for deriving the program classification code from the video component of the program.

25. A video program receiver according to claim 14, including means for deriving the program classification code from the audio component of the program.

26. A video program receiver according to claim 14, including means for receiving program classification code from a source other than the program being received.

\* \* \* \* \*

# Exhibit "B"

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,733 | 09/26/2005 | 4930160 | 487132800100 | 2180 |

| 37086      7590      12/04/2008 | EXAMINER |
|---|---|
| NOVAK DRUCE & QUIGG, LLP | |
| (NDQ REEXAMINATION GROUP) | |
| 1000 LOUISIANA STREET | ART UNIT            PAPER NUMBER |
| FIFTY-THIRD FLOOR | |
| HOUSTON, TX  77002 | |

DATE MAILED: 12/04/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

David L. Fehrman
Morrison and Foerster, LLP
555 W. Fifth St. Suite 3500
Los Angeles, CA 90013

**MAILED**

**DEC 0 4 2008**

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,733*.

PATENT NO. *4930160*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

MORRISON & FOERSTER, LLP
555 WEST FIFTH STREET
SUITE 3500
LOS ANGELES, CA 90013-1024

**MAILED**

**DEC 0 4 2008**

CENTRAL REEXAMINATION UNIT

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,243*.

PATENT NO. *4930160*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,243 | 01/08/2007 | 4930160 | 8086.002.RXUS00 | 6416 |

37086      7590      12/04/2008

NOVAK DRUCE & QUIGG, LLP
(NDQ REEXAMINATION GROUP)
1000 LOUISIANA STREET
FIFTY-THIRD FLOOR
HOUSTON, TX  77002

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 12/04/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| | Control No. | Patent Under Reexamination |
|---|---|---|
| **Notice of Intent to Issue**<br>**Ex Parte Reexamination Certificate** | 90/007,733, ~~90/008,243~~ | 4930160 |
| | **Examiner**<br><br>OVIDIO ESCALANTE | **Art Unit**<br><br>3992 | |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of

    (a) ☒ Patent owner's communication(s) filed: <u>25 September 2008</u>.
    (b) ☐ Patent owner's late response filed: _____.
    (c) ☐ Patent owner's failure to file an appropriate response to the Office action mailed: _____.
    (d) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).
    (e) ☐ Other: _____.

    Status of *Ex Parte* Reexamination:
    (f) Change in the Specification: ☐ Yes ☒ No
    (g) Change in the Drawing(s): ☐ Yes ☒ No
    (h) Status of the Claim(s):
        (1) Patent claim(s) confirmed: <u>3,6,7,16,19 and 20</u>.
        (2) Patent claim(s) amended (including dependent on amended claim(s)): _____
        (3) Patent claim(s) cancelled: <u>1,2,4,5,8-15,17,18 and 21-26</u>.
        (4) Newly presented claim(s) patentable: _____.
        (5) Newly presented cancelled claims: _____.

2. ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

3. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

4. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08).

5. ☐ The drawing correction request filed on _____ is: ☐ approved ☐ disapproved.

6. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All b)☐ Some* c)☐ None of the certified copies have
        ☐ been received.
        ☐ not been received.
        ☐ been filed in Application No. _____.
        ☐ been filed in reexamination Control No. _____.
        ☐ been received by the International Bureau in PCT Application No. _____.

    * Certified copies not received: _____.

7. ☐ Note attached Examiner's Amendment.

8. ☐ Note attached Interview Summary (PTO-474).

9. ☐ Other: _____.

| | | |
|---|---|---|
| | | |

cc: Requester (if third party requester)

Application/Control Number:  Page 2
90/007,733; 90/008,243
Art Unit: 3992

## DETAILED ACTION

1.     This action is in response to the Patent Owner's Response filed on September 25, 2008

and the personal Interview held on October 16, 2008.

### *Expired Patent and Status of Claims*

37 CFR 1.530(j) states that "[n]o amendment may be proposed for entry in an expired

patent. Moreover, no amendment, <u>other than the cancellation of claims</u>, will be incorporated into

the patent by a certificate issued after the expiration of the patent."

The Patent Owner has complied with the issues set forth for an expired patent and thus

the amendment submitted after the expiration of this instant patent is entered and the status of the

claims is now as follows:

Original claims 1-2, 4-5, 8-15, 17-18 and 21-26 <u>are canceled</u>;

Original claims 3, 6, 7, 16, 19, 20 <u>are pending</u>.

### *Priority Determination*

*"local to the receiving station"*

As stated in the Australian Patent Document P1-4107 at pages 12-13:

"Censorship controller 7 receives the extracted classification word, and compares it with
a range of classifications previously entered by the operator using user interface 8. If the
current classification matches one of those selected to be censored by the operator, censor
output 9 becomes activated. Censor output 9 activates control input 10 of the video tape
recorder and/or control input 11 of the television receiver, causing certain automatic
censorship actions to happen. The desired actions are selected by the operator and can
include the following examples : ...

Application/Control Number:                          Page 3
90/007,733; 90/008,243
Art Unit: 3992

**d) Switch to alternative programme  Example:**
  **Replace advertisements <u>with soothing images of tropical fish</u>,**
  **news and information items from Teletext or other source,**
  **or alternative advertisements from another source."**

As previously argued, the Examiner notes the PI-4107 priority document makes no specific reference to whether or not the alternative program is generated or received from a "local" source.

As disclosed in PI-4107, examples of "alternative programs" can be e.g., to replace advertisements with "soothing images of tropical fish", "news and information items from Teletext" or other source or alternative advertisements from another source.

In the interview held on October 16, 2008, the Patent Owner explained that with the examples given in the Australian Patent, it is clear the "images of tropical fish" is not from "another source". That is, with the three examples, both the news and information items come from either Teletext or other source and the alternative advertisements come from another source.

The Patent Owner maintained that this clearly shows the "images of tropical fish" are <u>not</u> from another source and hence would come from a local source

As stated in the Patent Owner Interview Summary filed on October 29, 2008,

"...the fact that the soothing images of tropical fish were not designated as coming from another source, while the other two of the three examples were, can be seen as supporting the declarants's conclusion that to him, "it is clear the tropical fish image generation described is locally generated."

Application/Control Number:                                  Page 4
90/007,733; 90/008,243
Art Unit: 3992

The Examiner agrees, the cited portions of the Australian Patent appears to disclose the images of tropical fish may not from the same source as the news and information and alternative advertisements. The Examiner, however, notes that this in no way entails or clarifies that the images of tropical fish are locally sourced. The mere showing that the images of tropical fish are not from the same source as the news and information items or alternative advertisements does not bring to light whether the images of tropical fish were locally sourced. The Examiner notes that the same argument holds true for the news and information items and alterative advertisements. Both come from another source or other source, but "other source" or "another source" is not defined. The only clear source that is listed is "Teletext". The "other/another source" is not defined and shows no relationship or comparison between even being a remote source or local. The Examiner however has accepted that the news and information items and the alternative advertisements were remotely sourced based upon its use of Teletext and since it is generally known in the art that Teletext is broadcast from a remote source and advertisements are likewise remotely generated.

The Patent Owner, in their Interview Summary, acknowledged that "it is more probable and logical that the first images would be sourced locally.

The Examiner notes that this conclusion was made based on an argument the Examiner raised with the issue that it was conceivable at the time to have tropical fish images being broadcast on a specific channel. The Examiner noted that since it was technologically possible,

Application/Control Number:                                                   Page 5
90/007,733; 90/008,243
Art Unit: 3992

then the disclosed tropical fish images can be seen by one of ordinary skill in the art as coming

from a remote source.

    The Examiner reiterates that just because a certain scenario is "more probable" to occur,

it does not mean that the more probable scenarios occurs or is supported by the Australian

priority document.

    As noted by the Patent Owner in their response (filed on September 25, 2008), "the test

for sufficiency of support in a parent application is whether the disclosure of the application

relied upon 'reasonably conveys to the artisan that the inventor had possession at the time of the

later claimed subject matter.'"

> The Patent Owner acknowledges" the presence of the words "clear, and concise" in 35
> U.S.C. §112 ¶ 1, but the existence of these words does not read them into the standard for
> written description requirement. While the statue severs as a basis, it is the Courts'
> interpretations that control application of the law. As evidence by the numerous opinions
> of the Courts with regard to the written description requirement, the settled law in this
> regard does not require a clear and concise description as is being asserted by the
> Examiner.

## 35 U.S.C. 112 1st paragraph:

    The specification shall contain a written description of the invention, and of the manner
and process of making and using it, in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it is most nearly connected, to make
and use the same, and shall set forth the best mode contemplated by the inventor of carrying out
his invention.

Application/Control Number:                                          Page 6
90/007,733; 90/008,243
Art Unit: 3992

The Examiner acknowledges *35 U.S.C. 112, first paragraph,* sets forth the minimum

requirements for the quality and quantity of information that must be contained in the patent to

justify the grant.


In addition, as per *MPEP 2163 [R-5]*

To satisfy the written description requirement, a patent specification must describe the
claimed invention in sufficient detail that one skilled in the art can reasonably conclude
that the inventor had possession of the claimed invention. See, e.g., Moba, B.V. v.
Diamond Automation, Inc., 325 F.3d 1306, 1319, 66 USPQ2d 1429, 1438 (Fed.
Cir. 2003); Vas-Cath, Inc. v. Mahurkar, 935 F.2d at 1563, 19 USPQ2d at 1116.


As per *MPEP 2163 [R-5]  (II)(A)(2)(b*

To comply with the written description requirement of 35 U.S.C. 112, para. 1, or to be
entitled to an earlier priority date or filing date under 35 U.S.C. 119, 120, or 365(c), **each claim
limitation must be expressly, implicitly, or inherently supported in the originally filed
disclosure.** When an explicit limitation in a claim "is not present in the written description
whose benefit is sought **it must be shown that a person of ordinary skill would have
understood, at the time the patent application was filed, that the description** requires that
limitation." Hyatt v. Boone, 146 F.3d 1348, 1353, 47 USPQ2d 1128, 1131 (Fed. Cir. 1998). See
also In re Wright, 866 F.2d 422, 425, 9 USPQ2d 1649, 1651 (Fed. Cir. 1989).


The Examiner maintains, in view of MPEP 2163 that **support may not be established by**

probabilities or possibilities. The mere fact that a certain thing may result from a given set of

circumstances is not sufficient.


The Patent Owner's attempted to show that a person of ordinary skill (i.e. Novak and

Vogel declarations) would have concluded that the cited portions in the Australian priority

document showed a "local" source of information.

Application/Control Number:                                        Page 7
90/007,733; 90/008,243
Art Unit: 3992

The only factual argument from the declarations is based on their opinion that since the

"tropical fish images" are not from another source or other source then it would be from a local

source.

However, as further noted, "other" or "another" source is not clearly defined and

furthermore, the absence of description from what source the images of tropical fish comes from

would not default to a non-disclosed local source. <u>At best, it is a source that is not the same as</u>

<u>the other two sources.</u>

Thus, the Examiner maintains that the priority document does not support the claimed

limitation of "local to the receiving station" and thus does not grant the Patent Owner's priority

to the Australian application for those claims that recite "local to the receiving station".

### *Novak in view of Motoyama*

The Patent Owner states that Motoyama teaches away from being combined with Novak

because Novak will never output a high noise signal as required by Motoyama, and thus Novak

will never trigger a response from Motoyama to display a locally generated alternative source of

video signal.

The Patent Owner maintains that Motoyama's microprocessor requires a "detect signal"

that causes the microprocessor to output its lost signal notification, but the Novak reference does

not supply such a detect signal.

In the Interview Summary, the Patent Owner states with regards to figure 1 of the Novak

reference, the "Alternative Program Signal 12" is shown to seemingly constantly flow into

Application/Control Number:                          Page 8
90/007,733; 90/008,243
Art Unit: 3992

censorship device 102. There is no discussion in the Novak reference of a signal sent that

initiates transmission of Alternative Program Signal 12. Since this Alternative Program Signal 12

in the Novak reference appears to always be input and available to be switch to, it was agreed

that the Alternative Program Signal 12 is more like a broadcast signal which would not be a local

signal.

In the Interview Summary, the Patent Owner notes the fact that the Novak reference does

not send a signal that could initiate transmission of its Alternative Program Signal 12 also means

the Novak reference does not have a "detect signal" capable of initiating output of Motoyama's

alternative source of video content (lost signal notification) from Motoyama's microprocessor.

In the Patent Owner's after final response, the Patent Owner contends Novak deals with

displaying alternative programming in response to an event with an incoming program; namely

the event of content restriction based on censorship. Motoyama on the other hand deals with

sensing that a lost signal condition exists; effectively, there is no "current program" aspect in

Motoyama. What the viewer in Motoyama is informed of is the "lost signal" condition.

Therefore, Motoyama does not presuppose a "current program [that] is not being showed," but

merely reacts anytime a high noise condition is detected.

*Examiner's Response*

Novak discloses, as shown in section 102 of FIG. 1, capability for switch (11) to output

an alternate signal (12) is provided by also inputting alternate signal (12) to a source selection

switch (11) which has been arranged to switch its output between the unedited program signal

(1) and the alternate signal (12) as commanded.

Application/Control Number:                                                    Page 9
90/007,733; 90/008,243
Art Unit: 3992



FIG. 1

As shown in the above figure, Alternate Program 12 along with Unedited Input Signal 1 is input into the Source Selection Switch 11. The Examiner agrees with the Patent Owner that the Alternative Program Signal 12 is constantly being input and available to be switch to (or at least input in the same manner as Unedited Input Signal 1 would be inputted).

The Novak patent also discloses that the alternate signal input 12 **may** in some embodiments comprises a zero value signal, i.e., no signal, such as when it would be desired to replace the portions to be deleted from unedited broadcast signal with no other program material.

*Novak Declaration (December 03, 2007)*

Application/Control Number:                                    Page 10
90/007,733; 90/008,243
Art Unit: 3992

The Novak Declaration discloses that his patent teaches that a result of editing the

broadcast signal <u>would be a blanked screen.</u> The Novak declaration also acknowledges that the

"censored signal" can be the <u>absence</u> of any signal at all.

The Novak declaration states that the '213 patent <u>does not teach or suggest a technique</u>

<u>that allows television manufactures to **build into the television set itself** control circuitry that</u>

<u>generates a censoring signal, the content of which, when displayed during periods of censorship,</u>

<u>was sure to not confuse users that their television was manufacturing.</u>

<u>Novak discloses that is patent does not disclose incorporate the circuitry of the system in</u>

<u>a television. In addition, the patent does not disclose **affirmatively displaying any signal** during</u>

<u>censorship.</u> Instead the patent teaches an embodiment where "no signal" is sent to the display

during period of censorship

The Examiner, as previously noted, disagreed with the Novak declaration since the

arguments made by Novak was made on the pretext that "local" is defined as not being "within a

television set".

The Examiner notes that as defined by the Vogel Patent, "the alternative material selected

during censorship periods can originate from a remote source, for example another television

broadcast, or locally, for example from a video disk or tape player. The local source may also be

simply a black signal generator."

The Examiner notes that the only local source of video disclosed by Vogel includes video

disk or tape players and black signal generators. The Examiner also notes that Vogel does not

disclose the exact location of the black signal generator other than the fact that it is local. <u>The</u>

Application/Control Number:                                    Page 11
90/007,733; 90/008,243
Art Unit: 3992

<u>Examiner admits that previously (at least with respect to the previous advisory action) he had</u>
<u>erroneously included the signal generator to be "within the television set" itself.</u>

The Examiner had previously noted on record that the instant disclosure, as originally

filed, <u>does not</u> appear to provide support for a recitation in which the "alternative source of video

signal" is recited as being located within a "television set" (see response mailed on October 1,

2007). Thus, contrary to the Patent Owner's statement (page 18 of the response filed on

September 25, 2008), claims 3, 6, 7, 16, 19 and 20 <u>should not be construed **as within the**</u>

<u>**television set itself.**</u> Furthermore, the Patent Owner admits that if the rejection is withdrawn <u>this</u>

<u>claim interpretation is unwarranted and unnecessary.</u>

Thus, the Examiner notes that "local" remains as being defined consistent with the

disclosed description in Vogel and thus "the alternative material selected during censorship

periods can originate [from a remote source, for example another television broadcast, or]

<u>locally, for example from a video disk or tape player. The local source may also be simply a</u>

<u>black signal generator."</u>


The Examiner relied on this claim interpretation to dispute the Novak declaration since

Novak's main argument was based on the fact that the receiver was not included within a

television set.

The Examiner agrees that if the claim was narrowly construed to be limited to "within the

television set itself" then Novak would fail to anticipate the claim. The Examiner however, did

not accord the definition set by the Novak declaration in construing the claims but instead gave

the defined definition and interpretation that was consistent with the Vogel Patent.

Application/Control Number:                                    Page 12
90/007,733; 90/008,243
Art Unit: 3992

In Motoyama, a microprocessor 30 is provided and it produces an alternative video signal

in response to a detect signal of switch 22. The alternative video signal is applied from the

microprocessor 30 to the video/RGB switch 36 and then through the video//RGB circuitry 38 to

the cathode ray tube 40 to visually announce the lost carrier condition. Motoyama discloses the

alternate signal is applied when the disable signal is present at switch 22

The Examiner agrees with the Patent Owner that the visual announcement of Motoyama

is employed only in response to a noise detect signal.

The Examiner disagrees that it would not have been obvious to use a message/visual

announcement system in Novak. However, in view of the arguments presented in the last

Interview, the Patent Owner pointed out that with Novak the "Alternative Program Signal 12" is

shown to seemingly constantly flow into censorship device 102. There is no discussion in the

Novak reference of a signal sent that initiates transmission of Alternative Program Signal 12.

Since this Alternative Program Signal 12 in the Novak reference appears to always be being

input and available to be switch to, it was agreed that the Alternative Program Signal 12 is more

like a constant signal and not one that activates or retrieved based upon a trigger.

Any proposed combination with Novak would require a message to be constantly input

into the switch of Novak. In Motoyama a noise detect signal is used to trigger the output of a

message. No such detect signal is disclosed by Novak. Instead the processor 17 sends an

enabling signal to control the input of source selection switch 11. The alternate source is

Application/Control Number: 90/007,733; 90/008,243
Art Unit: 3992

Page 13

presumed to be in place or ready for output. There is no need to trigger the activation of an

alternate source since the alternate source is already present.

Each of the embodiments disclosed by Novak is directed to either displaying an

alternative program or a blank screen. The Examiner notes a blank screen is a result of no-signal

being sent, that is, nothing will be output. Thus, Novak specifically discloses of not displaying an

image and thus does not disclose selecting an alternative video program to be displayed. After

further review of Novak it is clear that no disclosure of what this alternate signal other than the

signal being a zero value signal, no signal or no other program material is discussed. Thus, there

appears to be no visual image that would be displayed. While Motoyoma provides for a message

generation feature, this processor is within the television set whereas the editing device of Novak

is outside the television set. In addition, the Examiner notes that when properly combined, the

microprocessor of Motoyama would have to be constantly fed into the source selection switch.

This disclosure/embodiment is not discussed/suggested by either Novak or Motoyama.

The Examiner notes that the combination of Novak and Motoyama fails to render

obvious the claimed limitations of providing a locally generated message in combination with

the rest of the limitation of the claims. While, local generated messages are well known in the

art, the circuitry of Novak prevents the adoption of the messages that are stored as in the system

of Motoyama since the system would require a constant feeding of a message to the source

selection switch. Such disclosure is neither apparent nor reasonable in view of Novak. While

that type of requirement is not disclosed by the claims, it is undoubtedly required if Novak is to

be combined with Motoyama for the acceptance of the message of Motoyama.

Application/Control Number:                                    Page 14
90/007,733; 90/008,243
Art Unit: 3992

In other words Novak does not allow for any displayable content, and its circuit design is

evidence of that type of system that would prevent content from being displayed. Novak is

designed for the acceptance of zero value signal or the like for the non-displaying of program

signals. In combination, the Examiner also notes that the signal present in Motoyama is activated

only when there high noise that is cause by no program being received. This will only notify a

user of lost of program and not of any other type of detected issue.

Thus, the Examiner agrees with the Patent Owner's argument and will not maintain the

rejection of Novak in view of Motoyama.

### *Secondary Considerations*

#### *Thomas E. Coverstone (May 27, 2008)*

Discussed the licensing of the '160 Patent to more than thirty-seven companies. Mr.

Coverstone stated that all modern-day television that implement V-chip technology do so by

delivery a true, locally generated alternate signal (not a different channel or a message

transmitted by the TV station) during program censorship.

Mr. Coverstone provides a claim chart equating the claims of the '160 patent to at least

12 infringing devices.

In the May 27, 2008 Patent Owner response, the Patent Owner contends that licenses are

often used as evidence of commercial success. The evidentiary value of the licenses depends to a

great extent on the nexus between the licenses and the claimed invention.

Application/Control Number:                                    Page 15
90/007,733; 90/008,243
Art Unit: 3992

The Examiner notes that the Patent Owner acknowledges that in *In re GPAc, Inc.*, the court found that a nexus was not established just because a long list of licenses was presented as evidence of commercial success. The Examiner notes that the provided claim charts attempt to provide the needed nexus.

The Examiner acknowledges to be given substantial weight in the determination of obviousness or nonobviousness, evidence of secondary considerations must be relevant to the subject matter as claimed, and therefore the examiner must determine whether there is a nexus between the merits of the claimed invention and the evidence of secondary considerations. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n.42, 227 USPQ 657, 673-674 n. 42 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986). The term "nexus" designates a factually and legally sufficient connection between the objective evidence of nonobviousness and the claimed invention so that the evidence is of probative value in the determination of nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 7 USPQ2d 1222 (Fed. Cir.), cert. denied, 488 U.S. 956 (1988).

The Examiner further notes that evidence pertaining to secondary considerations must be taken into account whenever present; however, it does not necessarily control the obviousness conclusion. See, e.g., *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372, 82 USPQ2d 1321, 1339 (Fed. Cir. 2007) ("the record establish [ed] such a strong case of obviousness" that allegedly unexpectedly superior results were ultimately insufficient to overcome obviousness conclusion); *Leapfrog Enterprises Inc. v. Fisher-Price Inc.*, 485 F.3d 1157, 1162, 82 USPQ2d 1687, 1692

(Fed. Cir. 2007)("given the strength of the prima facie obviousness showing, the evidence on

secondary considerations was inadequate to overcome a final conclusion" of obviousness); and

*Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768, 9 USPQ2d 1417, 1426 (Fed. Cir

1988). Office personnel should not evaluate rebuttal evidence for its "knockdown" value against

the prima facie case, *Piasecki,* 745 F.2d at 1473, 223 USPQ at 788, or summarily dismiss it as

not compelling or insufficient. If the evidence is deemed insufficient to rebut the prima facie case

of obviousness, Office personnel should specifically set forth the facts and reasoning that justify

this conclusion.


      As stated in the previous Advisory Action, since the record had established a strong cause

of obviousness with respect to the combination of Novak and Motoyama, the Examiner

considered the Patent Owner's submissions under "secondary considerations" but will maintain

the rejection in view of the above obviousness disclosure.

      The Patent Owner stated that commercial success (with a strong nexus) is among the

strongest of the secondary considerations and good evidence of commercial success can even

overcome "strong" cases of obviousness. The Patent Owner cited *Simmons Fastener Corp v.*

*Illinois Tool Works, Inc.*, 739 F.2d 1573 (Fed. Cir. 1984).

      During the Interview, held on October 16, the Examiner dismissed the cited case since no

final decision was made with respect to the "secondary considerations". The Examiner noted that

the Federal Circuit case was remanded back to the District Court and the secondary consideration

issues was not further discussed since the parties had settled.

Application/Control Number:                                    Page 17
90/007,733; 90/008,243
Art Unit: 3992

The Patent Owner now refers the Examiner to *In re Piasecki, Alco Standard Corporation*

*v. Tennessee Valley Authority* and *Allen Archery Inc. v. Browning Manufacturing Co.*

However, as per the response regarding the combination of Motoyama and Novak as

disclosed above this issue is moot and no further comments will be made. .

## STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

The following is an examiner's statement of reasons for patentability and/or confirmation

of the claims found patentable in this reexamination proceeding:

### In regards to Chard 4,605,964:

In the request for reexamination filed on September 29, 2006, the Requester stated that

"Chard discloses a message display control unit 48 that "includes a character generator and

various control circuitry", that generates a video signal locally. The input to the display control

unit 48 is not a video signal, and the display control unit 48 is therefore the "source" of the

alternative video signal and is local to the receiver.

According to the Chard declaration (July 28, 2006) the content of the teletext <u>originates</u>

from and is dictated by the video signal sent to the television set by Transmitter 37.

Previously, the Examiner stated that the teletext decoding circuitry necessarily included

character generators for local generating/synthesizing the teletext messages that are displayed.

The Patent Owner contended that "displaying the selected video signal" makes clear that

the recited "selected video signal" that is displayed on the video display necessarily encompasses

Application/Control Number:                                    Page 18
90/007,733; 90/008,243
Art Unit: 3992

the displayable aspects (i.e. content) of that video signal. The Patent Owner states when properly

interpreting the claim, the displayable aspects (or content) of the alternative source of video

signal are required to originate local to the received station, (emphasis added).

        The Examiner notes that the Patent Owner's arguments in combination with the

submitted declaration of Frederick W. Chard with respect to '964 Chard Patent that both the

received program and alternative video signal (teletext) originate from the same source is

persuasive and thus Chard '964 does not anticipate or render obvious the claims.


**In regards to Chard '341,**

        In the Request for reexamination, the Requester states Chard discloses provision of a

local alternative video signal such as from a VCR. Specifically Chard discloses video playback

apparatus, video game-playing apparatus, or a data display service (teletext or viewdata) could

be enabled whenever there is no selected transmission being output, (pages 12-13).

        In the Office Action mailed on October 1, 2007, the Examiner acknowledged that Chard

'341 indicates that the video signal is simply blanked and more specifically does not teach a step

of displaying a "local" alternative source of video in place of the video signal that is blocked.

The Examiner further acknowledged that Chard '341 suggested that an alternative configuration

was possible in which an alternative video signal source, producing an alternative video signal

source, was enabled whenever no selected transmission was being outputted by the system.

        "Alternatively, video playback apparatus, video game-playing apparatus, or a data
        display service (teletext or viewdata) could be enabled whenever there is no selected
        transmission being output"

Application/Control Number:                                      Page 19
90/007,733; 90/008,243
Art Unit: 3992

    The Examiner again notes herein that on pages 12 to 13, Chard '341 discloses of several alternative embodiments. On page 12, lines 22-page 13, line 3, Chard '341 discloses the activation of a video recorder coupled to the television set. The video recorder runs for the duration of a selected transmission and then stopped based on the code word. The Examiner notes that no further explanation as per this scenarios is further disclosed. The Examiner notes that this appears to be directed to recording selected transmissions and starting and stopping the recording based on code words in the transmissions.

    On page 13, lines 4-12, Chard '341, as disclosed above, discloses that when time transmission of a viewdata service is being monitored, selection is effected on the basis of combination of parameters A1 and A2 and video game-playing apparatus can be controlled in the same manner as any other channel so as to be usable only at certain times.

    Chard '341 finally discloses "video playback- apparatus, video game-playing apparatus, or a data display service (teletext or videodata) could be enabled whenever there is not selected transmission being output.

    However, as previously acknowledged, while Chard '341 allows for a local output of video from "video playback apparatus or video game-playing apparatus" Chard '341 does not disclose that this is enabled i.e. the video playback device or video game-playing apparatus in response to determining, based on the claimed comparison step, that an alternative "local" video source is to be displayed.

    Thus, Chard '341 does not disclose in response to comparing the received program classification code with the contents of the memory means, determining that a local video signal should be selected for display.

Application/Control Number:                                    Page 20
90/007,733; 90/008,243
Art Unit: 3992

***In regards to Mori -JP 59-120782:***

Mori discloses in one embodiment of a PG code signal being received. If the PG code signal satisfies the level of the PG code signal stored in the memory it reads and deciphers the scramble code and then descrambles the image signal. If the PG code level does not satisfy the level, the microcomputer does not read the scramble code and the specific channel (alternative channel) is selected so that normal image is projected on the television receiver continuously.

The Patent Owner's response, submitted July 28, 2006, states Mori calls for video censoring by way of changing television channels. For example, if a user attempts to tune a television to Channel 2 (and Channel 2 is broadcasting a program deemed unsuitable for viewing), Mori discloses a system that instead tunes the receiver to a different (more suitable) channel.

In addition the Patent Owner states Mori does not discloses the "a local alternative source of video" since Mori discloses a signal source of video signals - the transmitter that transmits a signal collectively consisting of 60 television channels.

The Examiner agrees that Mori does not disclose selecting a "local alternative source of video" to be used but instead discloses of selected a remote source (i.e. a different broadcast channel).

Thus, Mori does not disclose in response to comparing the received program classification code with the contents of the memory means, determining that a local video signal should be selected for display.

Application/Control Number:                             Page 21
90/007,733; 90/008,243
Art Unit: 3992

*In regards to Novak US Patent 4,750,213:*

    See the above discussion with respect to Novak and Motoyama.

*In regards to Block US Patent 4,484,217:*

    Block discloses a parental control system in which both tier and category information are stored in memory and compared with received program data. (col. 9, line 60 to col. 10, line 16). The category code is compared to a category code selected by the subscriber through keyboard interface 52 and stored in memory 90. (col. 11, lines 39-44). If the codes do not correspond, a message is displayed on the controller display indicating that the subscriber is not authorized to receive the program. (col. 11, line 59 to col. 12, line 18).

    The Patent Owner has argued that Block discloses a set top box and displays content that is not local. In the Patent Owner's response, filed on July 28, 2006, the Patent Owner states Blocks does not disclose a television receiver; it discloses a set-top-box (a.k.a. a "decoder") that can interface with a television. The Patent Owner contends the "wrong category" message generated by Block is not generated *local* (i.e. internal) to the receiving station as required by claims 3 and 6 of the '160 patent. The 'wrong category" message in Block is not used as a censoring signal as also required by claims 3 and 6. The Patent Owner states that in the claims, the alternative signal is used to replace the primary signal during periods of censorship. In contrast, Block clearly only indicates that the "wrong category" message is displayed on Display 50, which is the display of the set-top-box, not the video screen.

    The Examiner acknowledges that the Block declaration, filed on July 28, 2006, states that his '217 patent discloses that the "wrong category" message generated by the '217 patent is not a

Application/Control Number:                              Page 22
90/007,733; 90/008,243
Art Unit: 3992

video signal, but is a text message displayed on a Display 50, which is the display on the set-top

box, not on the television set. Mr. Block also noted that "wrong category" signal is not a signal

used to censor a program.


        Thus, the Examiner notes that Block does not disclose in response to comparing the

received program classification code with the contents of the memory means, determining that a

local video signal should be selected for display and displaying the selected video signal on a

video display means.


### In regards to Inagaki US Patent 4,896,354:

        In the request for reexamination filed on September 29, 2006, the Requester contends

Chard and Inagaki both disclose parental control systems that block a program and display a

message from an alternative source - a local character generator. Inagaki describes a system in

which the information for the message generated by the character generator is transmitted. The

Request also contends that Inagaki also specifically discloses that the message to be displayed

can instead be prepared at the receiving side, (col. 6, lines 4-44). In addition, Inagaki discloses

that in the channel blocking mode, a locally stored and generated message "BLOCKED" is

displayed when the television receiver is tuned to a blocked channel.

        The Patent Owner argued in their response filed on December 3, 2007 that in Inagaki, the

source of the alternative video signal is remote from the receiving stations. The Patent Owner

notes that "Blocked By Center" message is "transmitted form the transmitted side", which clearly

is not local to the receiver or alternate to the received video signal.

Application/Control Number:                                    Page 23
90/007,733; 90/008,243
Art Unit: 3992

The Examiner agrees with the Patent Owner that Inagaki does not disclose displaying a

local alternative video based on the claimed comparison step.

Thus, the Examiner notes that Inagaki does not disclose in response to comparing the

received program classification code with the contents of the memory means, determining that a

local video signal should be selected for display.

### In regards to Benjamin US Patent 4,768,229

Benjamin discloses a restrictive access system for parental control in which a local

microprocessor control. 18 is employed to generate a video signal containing a message at the

receiver based on information available at the receiver when a program is blocked based upon a

comparison between a television receiver tuned to a restricted channel and a memory that

contains a list of channels to be blocked.

The Examiner notes that Benjamin limits tuning to only designated channels to provide a

parental control function. The Examiner further notes that the claim requires "receiving a video

signal...", "receiving a program classification code descriptive of said video signal." The

Examiner notes that while Benjamin outputs a message, this message is based on block channels

and not based on any received video signals or program classification codes that is descriptive of

the video signal. Benjamin relates to only allowing or denying access to channels and is not

concerned with any program codes.

Application/Control Number:                                      Page 24
90/007,733; 90/008,243
Art Unit: 3992

     Thus, the Examiner notes that Benjamin does not disclose "receiving a video signal…",

"receiving a program classification code descriptive of said video signal" and in response to

comparing the received program classification code with the contents of the memory means,

determining that a local video signal should be selected for display.

### In regards to Skerlos US Patent 4,633,297

     Skerlos discloses a television system having a teletext decoder that is also used to

generate a video signal for on-screen display message pre-stored locally in a page ROM 56 in the

television receiver.

     The Examiner notes that in Skerlos discloses a teletext processor with ROM for on-

screen messages. While it is clear that Skerlos is not directed to censoring any program or the

comparison of program codes, Skerlos discloses that it was well known in the art to store on-

screen messages locally. The Examiner however, notes that Skerlos was proposed to be used

with at least Chard. Chard specifically discloses that the teletext information is sourced from the

broadcaster. This information is imperative to the functionality of Chard since it is the

broadcaster who determines the programming codes. While local character generators for tele-

text are used in both Chard and Skerlos, the information that is used for the character generators

were derived from a remote source. In addition, there is no suggestion that the "on-screen"

messages of Skerlos would provide a local alternative source that would be usable with the

censoring system of Chard since the broadcaster has to submit the teletext information.

Application/Control Number:                                        Page 25
90/007,733; 90/008,243
Art Unit: 3992

*In regards to Campbell US Patent 4,536,791:*

Campbell discloses a parental control system that includes a text/graphics generator 118

that is used both for viewing of teletext and for display of messages relating to program blocking

as shown in Fig. 12 at 326 and 334. Access codes are stored in memory and compared with

transmitted codes. A message is displayed to indicate when a program is blocked. The

text/graphics generator 118 is local to the television receiver (see "TO TV" at 134 in Fig. 6).

Moreover, one of ordinary skill in the art would have recognized the content of the displayed

messages are originated locally, because the system described is a one-way system (see col. 11,

line 27 to col. 16, line 14) and the head end would not know what messages to transmit for

display in response to various user selections.

The Examiner notes Campbell like Chard discloses receiving teletext data. This data is

originally broadcast from a remote source. While text/character/graphics generators are local, the

information the generators use are from a remote source and not from a local source. Thus, not

local alternative video is displayed on the receiver means.


*In regards to Elam US Patent 4,554,584:*

Elam discloses an auxiliary circuit for blanking (audio and video) by digital code words

transmitted as part of the video signal. The circuit detects and decodes the transmitted code and

depending upon the code received, blanks either or both the audio and video signal in the

receiver. Elam uses the ASCII codes used to specify the movie rating (G, PG and R) for

program material and having the television receiver blank the picture and sound whenever the

rating level, based upon the code received, exceeds that selected by the viewer.

Application/Control Number:                                     Page 26
90/007,733; 90/008,243
Art Unit: 3992

The Examiner notes that Elam discloses a "blanking interface" with the television

receiver circuits which perform the video and audio blanking function. Elam notes video

blanking was accomplished by simultaneously grounding the voltages form both the brightness

control and the contrast control potentiometers.

The Examiner notes that Elam discloses of generating a blanking signal for subsequent

audio or video blanking relays. As stated above, Elam discloses video blanking was

accomplished by simultaneously grounding the voltages from both the brightness control and the

contrast control potentiometers.

Thus, in view of this embodiment no "alternative source of video" is displayed since

nothing is displayed, i.e. no video. The Examiner notes that the claims positively recites a video

source to be selected for display.

Additionally, the Examiner notes for an alternative embodiment, the Requester

acknowledges that although in Elam the received rating is also displayed even when the program

is not blocked, it would certainly be obvious to provide the display only when blocking is done

since that is when it is most desirable to provide information to the viewer to explain why the

program cannot be viewed.

Thus, the Requester acknowledges that Elam does not provide an alternative source of

video to be displayed in response to the claimed comparing step. The claims specifically require

selecting an alternative local source. The circuitry of Elam blanks the screen and thus does not

select or cause to be selected an alternative local video source since no video is displayed. The

blanking or no displaying of video is not considered a video source since no video is positively

Application/Control Number:                      Page 27
90/007,733; 90/008,243
Art Unit: 3992

displayed. The Examiner notes that while the Vogel Patent discloses of using a "black signal",

the Vogel Patent discloses that the black signal as being positively <u>generated</u> and hence video is

created using this black signal generator. While the end result of Elam may produce what

appears to be a blank/black screen, there is no positive generation of a black/blank signal for

output but instead the lack of any **positive generation of video for output**.


***In regards to Olivo US Patent 4,888,796:***

Olivo discloses a program material screening device in which a "material content signal"

("MCS") is provided to indicate the nature of a program. The MCS can take a wide variety of

forms, including tones, a radio signal simulcast, or a telecast independent of transmission of the

program signal.

The Olivo Patent further discloses a screening device (8A) detects the simulcast R

content signal (3) and <u>prevents the television set (7A) from replaying the movie (lA) from the</u>

<u>broadcast signal (1).</u> Thus, while Olivo prevents the displaying of objectionable content by the

television set, Olivo does not disclose of selecting for output an alternative local video source for

display during the preventing step.


Any comments considered necessary by PATENT OWNER regarding the above

statement must be submitted promptly to avoid processing delays. Such submission by the

patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.

Application/Control Number:                                    Page 28
90/007,733; 90/008,243
Art Unit: 3992

*Conclusion*

**NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS**
Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte* reexamination
or an *inter partes* reexamination is designated as the correspondence address of the patent.

*Revisions and Technical Corrections Affecting Requirements for Ex Parte and*
*Inter Partes Reexamination,* 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the**
**same correspondence address as that of the patent is, by way of this revision to 37 CFR**
**1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as
of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination
proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications
accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the
present proceeding is different from the correspondence address of the patent, it is strongly
encouraged that the patent owner affirmatively file a Notification of Change of Correspondence
Address in the reexamination proceeding and/or the patent (depending on which address patent
owner desires), to conform the address of the proceeding with that of the patent and to clarify the
record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:
Reexamination Practice                          (571) 272-7703
Central Reexam Unit (CRU)                        (571) 272-7705
Reexamination Facsimile Transmission No.         (571) 273-9900


2.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 4,931,160 throughout the course of this reexamination proceeding. See MPEP §§

2207, 2282 and 2286.

Application/Control Number:                                    Page 29
90/007,733; 90/008,243
Art Unit: 3992

3.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)).  Extension of time in *ex parte*

reexamination proceedings are provided for in 37 CFR 1.550(c).

4.      All correspondence relating to this *ex parte* reexamination proceeding should be directed:

By EFS:         registered users may submit via the electronic filing system EFS-Web, at
                https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html.


By Mail to:     Mail Stop *Ex Parte* Reexam
                Central Reexamination Unit
                Commissioner for Patents
                P.O. Box 1450
                Alexandria, Virginia 22313-1450

By FAX to:      (571) 273-9900
                Central Reexamination Unit

By hand:        Customer Service Window
                Attn: Central Reexamination Unit
                Randolph Building, Lobby Level
                401 Dulany Street
                Alexandria, VA 22314

        For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence
(except for a request for reexamination and a corrected or replacement request for
reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic
filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission
for each piece of correspondence stating the data of transmission, which is prior to the expiration
of the set period of time in the Office action.

Application/Control Number:                          Page 30
90/007,733; 90/009,243
Art Unit: 3992

　　　Any inquiry by the patent owner concerning this communication or earlier

communications from the Legal Advisor or Examiner, or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

*Ovidio Escalante*

Ovidio Escalante
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537

Conferee:                                           Conferee:

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV09- 813 JVS (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** 312 N. Spring St., Rm. G-8 Los Angeles, CA 90012 | [X] **Southern Division** 411 West Fourth St., Rm. 1-053 Santa Ana, CA 92701-4516 | [ ] **Eastern Division** 3470 Twelfth St., Rm. 134 Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Name & Address:
Gregor A. Hensrude, Esq.
Klinedinst PC
777 S. Figueroa St., 47th Floor
Los Angeles, CA 90017
213-607-2115/FAX 213-607-2116

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Guardian Media Technologies, Ltd.<br><br>PLAINTIFF(S)<br><br>v.<br><br>Benq America Corporation<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV09-0813 JVS MLGx**<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): Benq America Corporation

A lawsuit has been filed against you.

Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Edward E. Casto, Jr. _____, whose address is 5601 Bridge Street, Suite 300; Fort Worth, Texas 76112 _____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____JUL 15 2009_____

By: _Natalie Gongoria_
       Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>Guardian Media Technologies, Ltd. | **DEFENDANTS**<br>Benq America Corporation |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Gregor A. Hensrude, Esq.; Klinedinst PC<br>777 S. Figueroa St., 47th Floor<br>Los Angeles, CA  90017-213-607-2115 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No        ☐ **MONEY DEMANDED IN COMPLAINT:** $ According to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☒ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**SACV09-0813**

**FOR OFFICE USE ONLY:**   Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): cv08-08439R (Coby); cv09-02733R (Apex) (cases being refiled individually, case numbers not yet assigned)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.   Arise from the same or closely related transactions, happenings, or events; or
                              ☑ B.   Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☐ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☑ D.   Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
     ☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Texas |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
     ☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Orange County, California |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All, including Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
<u>Note: In land condemnation cases, use the location of the tract of land involved</u>

X. SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_     Date   7/14/2009

     Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |